### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

**JACOB DYLAN BARTLETT**                                                    **PLAINTIFF**

**VS.**                                            **CIVIL ACTION NO. 3:23-cv-00307-MPM-RP**

**CITY OF WINONA; OFFICER MATT MILETELLO,**
**Individually and in his official capacity as a**
**Winona Police Officer; and JOHN DOES 1-3**                     **DEFENDANTS**

### <u>ORDER</u>

This cause comes before the court on the motion of defendants City of Winona and its police officer Matt Miletello to dismiss this action, pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff Jacob Dylan Bartlett has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a § 1983 excessive force action, based on the Fourth Amendment to the U.S. Constitution, arising out of what plaintiff alleges to be unnecessary tasings which he suffered while being arrested for minor offenses on March 21, 2023. Defendant Miletello has elected to assert his qualified immunity defenses to these claims at the Rule 12 dismissal stage of the proceedings, and the City has also raised various defenses to its municipal liability. As a result, this court must do something which it frankly prefers not to do, namely rule upon the merits of a difficult § 1983 case at the very start of litigation and before any discovery has been performed. In so stating, this court would make the rather unsurprising observation that, the more it knows about a particular case, the more reliable its evaluation of that case tends to be. This court is also of the view that litigation is (or should be) a search for truth, and, that being the case, it is generally more interested

1

in the substantive merits of the case than in whether a complaint, which can always be amended, is a model of perfection.

This court would therefore ideally prefer to decide most § 1983 cases at the summary judgment stage, but its discretion to do so is considerably narrowed when it comes to qualified immunity motions filed by individual defendants. This court notes that, at one time, it was relatively rare to encounter Rule 12 qualified immunity motions, since litigants appeared to recognize that most § 1983 cases raise fact-intensive questions which are best addressed in the context of a summary judgment motion following discovery. In this court's experience, the number of Rule 12 qualified immunity motions has greatly increased following the Fifth Circuit's decision in *Carswell v. Camp*, 54 F.4th 307, 311 (5th Cir. 2022), where the court appeared to write disapprovingly of the practice of deferring ruling on qualified immunity issues until discovery had been performed. The Fifth Circuit's initial opinion in *Carswell*, released in June 2022, explicitly held that the limited qualified immunity-related discovery long permitted in this circuit under *Lion Boulos v. Wilson*, 834 F.2d 504, 508–09 (5th Cir. 1987) and its progeny had been implicitly overruled by the U.S. Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *Carswell v. Camp*, 37 F.4th 1062 (5th Cir. 2022). The Fifth Circuit's original opinion in *Carswell* made this overruling quite clear, writing "[c]all it 'careful,' or call it 'narrow'; either way, today we call *Lion Boulos* and its progeny overruled." *Carswell*, 37 F.4th at 1066.

In its modified opinion on denial of rehearing, the Fifth Circuit panel in *Carswell* removed any reference to the overruling of *Lion Boulos* and its progeny, perhaps in recognition of the fact that one Fifth Circuit panel may not overrule decisions of another panel.

Nevertheless, even the revised opinion in *Carswell* appears to provide a highly restrictive interpretation of the qualified immunity-related discovery permitted by *Lion Boulos*, stating that:

> Three points about this "careful procedure" bear emphasis. First, its purpose is only to allow the district court to rule on the defendant's assertion of QI; its purpose is not to provide a backdoor for plaintiffs to circumvent the defendant's immunity from suit. *Backe*, 691 F.3d at 649. Second, where the QI-asserting official determines that any pre-ruling discovery sought or ordered in the district court crosses the line from permissible *Lion Boulos* discovery to impermissible viOation of the official's immunity from suit, the collateral order doctrine authorizes an immediate appeal like the one we entertain today. *Ramirez* [*v. Guadarrama*], 3 F.4th [129] at 133 [(5th Cir. 2021)]. And third, *Lion Boulos* and its progeny must be understood in light of subsequent Supreme Court precedent. The Supreme Court has now made clear that a plaintiff asserting constitutional claims against an officer claiming QI must survive the motion to dismiss without any discovery.

*Carswell*, 54 F.4th at 311. It appears to this court that there presently exists considerable uncertainty regarding the state of Fifth Circuit law in this context, since the *Carswell* panel appeared to view the discovery long permitted by *Lion Boulos* with disfavor, although it stopped short, in its revised opinion, of declaring it overruled. This court believes that this is an area of the law which would benefit from clarification by the *en banc* Fifth Circuit, but, barring such, it will be hesitant to apply *Lion Boulos* in qualified immunity cases.

In light of the foregoing, this court will duly address the merits of Officer Miletello's qualified immunity defense in the Rule 12 context which he chose, but he must recognize the limitations which this choice places upon his arguments and upon this court's analysis. These limitations are particularly severe in this case, since defendant appears to concede that plaintiff's complaint properly alleges a Fourth Amendment excessive force claim. In seeking dismissal, defendant essentially argues that, while plaintiff "says the right things" in his complaint, his allegations in that complaint are contradicted by a single piece of evidence, namely the video of the arrest in this case. This video was attached as an exhibit to plaintiff's complaint, and it is therefore appropriate that this court address it in the Rule 12 context.

Defendant's reliance upon the video evidence is made more difficult by the fact that, in evaluating any uncertainties regarding what is depicted in it, this court must follow its customary summary judgment practice of viewing the evidence in the light most favorable to plaintiff, as the non-moving party. The U.S. Supreme Court made this clear in *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 1868, 188 L.Ed.2d 895 (2014), where it wrote that:

> In holding that Cotton's actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts of this case. By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party.

*Tolan*, 572 U.S. at 657, 134 S.Ct. 1861. *Tolan* makes it clear that, while the qualified immunity playing field is quite favorable to defendants in most respects, this does not extend to the standard for resolving any factual uncertainties in the evidence. In the qualified immunity context, just as in other Rule 12 or summary judgment contexts, these uncertainties must be resolved in favor of the plaintiff, as the non-moving party.

Having noted the factual standard of review, this court will now address defendant's qualified immunity motion as it relates to the Fourth Amendment excessive force claim against him. To establish a Fourth Amendment violation based on allegations of excessive force, a plaintiff must prove: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012). In *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the U.S. Supreme Court stated that the relevant factors for consideration on an excessive force claim include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." This court notes that the U.S.

4

Supreme Court has held that "objective unreasonableness is a question of law that can be resolved on summary judgment," *see Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015), but this obviously does not mean that federal judges are *required* to resolve Fourth Amendment excessive force cases on summary judgment. Indeed, in many cases, there will be disputed fact issues appropriate for resolution by a jury, which is why the Fifth Circuit has model jury instructions which specifically charge jurors with deciding "whether the force used was reasonable under the Fourth Amendment." *See* Fifth Circuit Model Jury Instruction 10.1.

In considering the excessive force claims asserted against Officer Miletello in his individual capacity, this court applies the Fifth Circuit's qualified immunity standard, which it has described as follows:

> This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

*Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007). Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir. 1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is not entitled to qualified immunity). Once again, plaintiff's burden in this regard includes an obligation to demonstrate that the defendants violated "clearly established law" at the time of the conduct in question.

With this precedent in mind, this court will now consider defendant's argument that he should be dismissed based solely upon the video evidence in this case. This court has carefully

reviewed the video of the arrest in this case, and, having done so, it seems clear that defendant's decision to emphasize this piece of evidence is based on what took place during the *early* stages of the arrest. In particular, the video clearly demonstrates how plaintiff repeatedly refused instructions from Officer Miletello to put his hands behind his back so that he could be handcuffed. Plaintiff's disobedience in this regard eventually led to his conviction for resisting arrest. While conceding his initial disobedience in this regard, plaintiff emphasizes that at no point did he take any violent or threatening acts towards Miletello, and he therefore contends that defendant's decision to repeatedly tase him constituted an objectively unreasonable use of force. In so arguing, plaintiff also notes that he was not suspected of having committed a violent crime, and he contends that this makes the decision to repeatedly tase him particularly indefensible.

Plaintiff's criminal convictions constitute an initial basis for defendants' motion to dismiss, based on the U.S. Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). The *Heck* analysis is fundamentally different from the qualified immunity analysis, since it does not make an inquiry into the validity of the plaintiff's claims, but, rather, considers whether they are inconsistent with a prior criminal conviction. In *Heck,* the Supreme Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486–87. The *Heck* rule was formulated in deference to the principle that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486. In *Heck,* the Supreme Court held that where a § 1983 suit for damages would "necessarily

imply" the invalidity of an inmate's conviction, or "necessarily imply" the invalidity of the length of any inmate's sentence, such a claim is not cognizable under § 1983 unless and until the inmate obtains favorable resolution of a challenge to his conviction. *Id.* at 487.

The prototypical § 1983 claim barred by *Heck* is a false arrest claim, since, in asserting such a claim, the plaintiff is alleging that he should not have been arrested for an offense for which he was convicted. In such a situation, the conflict between plaintiff's civil claims and the criminal conviction against him is obvious, and *Heck* presumably is the reason why plaintiff has not asserted a false arrest claim in this case. This court does not regard *Heck* as an obstacle to plaintiff's excessive force claims, however. In so stating, this court notes that some commentators have argued that *Heck* should be deemed *per se* inapplicable in excessive force cases, which tend to involve issues separate and distinct from the validity of the underlying conviction. In this vein, one treatise notes that:

> [T]here is now a split between the circuits as to whether *Heck* applies in suits for excessive force against police officers when brought by individuals who have been convicted. However, *Heck* would not seem to apply to such claims: whether the police used excessive force is completely distinct from whether the defendant committed the crime.

Chemerinsky, Erwin. Aspen Treatise for Federal Jurisdiction, p. 551. The Fifth Circuit has adopted no such categorical rule barring the application of *Heck* in excessive force claims, but it has been hesitant to apply it in this context. *See e.g. Ballard v. Burton*, 444 F.3d 391, 401 (5th Cir. 2006); *Wells v. Bonner,* 45 F.3d 90, 95 (5th Cir. 1995).

This court concludes that, even assuming that *Heck* would apply in *some* excessive force cases, it does not bar plaintiff's claims in this case, notwithstanding his conviction for resisting arrest. In so stating, this court notes that plaintiff suffered multiple tasings in this case, and in its order today, this court places primary emphasis on the final tasing which he suffered. Clearly, it

is possible for plaintiff to have resisted arrest in this case but for defendant to nevertheless have subjected him to an unnecessary number of tasings under the Fourth Amendment in response to that resistance.  As discussed below, this court regards the video evidence in this case as creating fact issues regarding whether defendant continued to subject plaintiff to tasings even after he had stopped resisting arrest, and it is thus apparent that a finding of excessive force in this case would not necessarily imply the invalidity of plaintiff's conviction for resisting arrest.   This court therefore finds that *Heck* is not an obstacle to plaintiff's excessive force claims, and it will therefore proceed to the merits of defendant's motion to dismiss those claims on the basis of the video of the arrest in this case.

In providing its impression of the early stages of the video, this court believes that much of it falls under a "grey area" of sorts, in which neither plaintiff nor Miletello come out looking particularly good.  The start of the video depicts plaintiff in the driver's seat of a vehicle parked on the side of a street facing traffic in front of a house.  Plaintiff's friend is in the front passenger seat of the vehicle.  In the video, Officer Miletello and his partner, Assistant Chief Calvin Young, explain that, while they can smell marijuana coming from the car, they emphasize that they are not concerned about this smell, but are, instead, investigating reports of a stolen bicycle in the front yard of the house.  [Video at 0:44].   The two officers do not articulate any suspicion that plaintiff or his friend stole the bicycle, but, since neither of them claim ownership of it, the officers announce that they will take the bicycle with them.  [Video at 3:02].

As the bicycle is being rolled away, plaintiff is seen in the video standing next to his car, making generalized negative commentary about these events, in particular the decision to remove the bicycle.  [Video at 3:25].  This court would characterize the nature of plaintiff's comments as mildly disrespectful and somewhat carping, but it frankly does not regard them as

sufficiently inflammatory to explain defendant's heated reaction to them. One possible reason for defendant's angry reaction arises from statements suggesting that bad blood existed between him and plaintiff, based on their prior dealings. Indeed, when defendant first recognizes plaintiff sitting in the driver's seat, he comments "you're already on thin ice- I didn't realize that was you sitting in the car." [Video at 1:27]. Later in the video, plaintiff states "I wasn't trying to give you a hard time" and defendant responds "you always do!" [*Id. at* 1:49].

At 4:17 of the video, the volume of complaining and backtalk emanating from plaintiff appears to bring defendant's temper to the boiling point, since he proclaims "I am this close … I am fixing to teach him a lesson."[1] When asked by plaintiff what he had done wrong, defendant responds at 4:38 of the video "you are illegally parked." When plaintiff asks "how am I illegally parked?" defendant responds, "you're fixing to learn a lesson" while agreeing with plaintiff that "it didn't have to come to this." At 5:08 of the video, defendant instructs plaintiff for the first time to put his hands behind his back. Plaintiff's response does not strike this court as being in any way violent, but he does not comply with the command and instead states, in the same disgruntled tone he uses throughout the video, says "officer, you are using your power wrong." [Video at 5:15]. After plaintiff refuses to comply with a few more orders to put his hands behind his back, defendant pulls out his taser at 5:25 of the video and tells plaintiff, in a tone of voice which clearly suggests anger on his part, "I am fixing to burn you the hell up!"

In spite of this warning, plaintiff continues to ignore commands to put his hands behind his back, and, at 5:51 of the video, he physically struggles to avoid being handcuffed. Plaintiff

---

[1] It appears to this court that, up until this point, the officers seemed content to simply leave with the bicycle and overlook the marijuana smell and the fact that the vehicle was parked on a street facing traffic. In so stating, this court notes that defendant's partner had just stated that "next time" they should be more respectful and cooperative to investigating officers.

continues to refuse repeated commands to put his hands behind his back, and, at 6:08 of the video, defendant physically places the taser against his body and tases him. After the initial tasing, plaintiff falls to the ground screaming, although he recovers from that tasing sufficiently to reiterate at 6:24 of the video "officer, you ain't using your power right!" Defendant continues to yell "put your hands behind your back," and he again places the taser against plaintiff's body. Plaintiff resumes screaming, in a manner which suggests that he has been tased again. By 6:50 of the video, plaintiff has been handcuffed, and he is placed in the patrol car.

     With this video evidence in mind, this court will address defendant's motion to dismiss the excessive force claim against him. Before doing so, however, this court will state for the record that it has considerable sympathy for plaintiff's dismay at being subjected to a physical arrest when the reason articulated for the offense he had committed was that he was "illegally parked."[2] Clearly, this is the sort of offense for which one can generally expect a ticket at most, and defendant's own words arguably suggest that he was being arrested more based on the officer's anger over his backtalk, rather than anything he did. This court notes that the video does depict plaintiff's car parked on the side of the road facing traffic, but, in his briefing, defendant submits no legal authority suggesting that an officer has the legal authority to arrest someone for parking on the wrong side of the road.

---

[2] This court notes that, in his brief, defendant asserts that "[o]n August 24, 2023, plaintiff was found guilty of misdemeanor resisting arrest and simple possession of marijuana under Miss. Code § 97-9-73." [Brief at 4]. However, plaintiff denies being convicted for marijuana possession, and he correctly notes that the Abstract of Judgment cited by defendant in support of contending otherwise only lists a conviction for resisting arrest. [Plaintiff's brief at 5, footnote 3]. Even if this court were to assume that plaintiff was, in fact, convicted of possession of marijuana, this was clearly not the offense for which Officer Miletello was attempting to arrest him when he "resisted arrest." To the contrary, the video makes clear that no marijuana had been discovered on plaintiff's body or in his vehicle at the time he was tased. This court further notes that there is no indication from either side's briefing that plaintiff was convicted of being illegally parked.

It seems possible that Miletello decided to arrest plaintiff because he refused his command to follow him to his police car, but at no point did he articulate this as the reason for his actions. This court notes that, after plaintiff initially refused commands to put his hands behind his back, he asked once again for what offense he was being arrested. In the court's view, defendant's response was arguably quite revealing, since he simply stated "NOW, resisting arrest" with the emphasis on "now." This court submits that saying a person is *only* being arrested for resisting arrest is rather illogical, since there must be some underlying offense for which the officer wanted to arrest the suspect in the first place. Or so it seems to this court.

While defendant's actions in this regard strike this court as quite questionable, it will not question their basic *legality* in light of plaintiff's resisting arrest conviction and *Heck*'s bar. In so stating, this court notes that while Mississippi law requires "an officer's attempt at a lawful arrest" to support a resisting arrest conviction, *see Edwards v. State*, 124 So.3d 105, 112 (Miss. Ct. App. 2013) (*citing* Miss. Code § 97–9–73), it appears to make it very difficult for a suspect to argue that an attempted arrest by an officer acting within the course and scope of his duties was not "lawful." *See, e.g. Chambers v. State*, 973 So. 2d 266, 271 (Miss. Ct. App. 2007). There is no question that Officer Miletello was acting within the course and scope of his duties as a police officer in this case, and this court will accordingly assume, in light of plaintiff's resisting arrest conviction, that the arrest attempted by defendant was "lawful." This court will so assume in spite of plaintiff's contention that, prior to convicting him, the municipal judge refused to watch the video of arrest. [Brief at 6]. Clearly, this is something which plaintiff should raise in any appeal of that criminal conviction, not in this lawsuit.

Even assuming the basic legality of defendant's actions, this court believes that his actions in the video are those of an officer who was unduly guided by his temper and what

appears to be a rather strong personal dislike of plaintiff. Indeed, this court's overriding impression from the video is that Officer Miletello displayed extremely questionable judgment and rather badly "lost his cool" under circumstances, namely mild backtalk by a suspect, which hardly seem to justify it. Clearly, defendant's statement that "I am this close … I am fixing to teach him a lesson" seems to reference his losing his temper, as does his threat, in an angry tone of voice, to "burn plaintiff the hell up" with his taser.

Having viewed the video of the arrest multiple times, this court can find nothing in plaintiff's actions which justify the level of anger exhibited by defendant. In so stating, this court notes that Officer Miletello's partner, Assistant Chief Young, heard the same backtalk and seemed inclined to let it roll off his back. Indeed, at one point in the video, Young, while taking the stolen bike which was the subject of the police visit, admonishes plaintiff and his friend to "next time" be more respectful of officers. This court's impression from this "next time" statement was that, in Young's view, the subject matter of the current visit was terminated, and he was prepared to go on to other business. It was only Officer Miletello who heard the same backtalk and felt compelled to teach plaintiff the lesson which resulted in this lawsuit.[3]

While noting its concerns about Officer Miletello's actions, this court does not intend to excuse plaintiff's refusal to put his hands behind his back and allow himself to be handcuffed. As discussed above, Mississippi law places heavy weight upon the simple question of whether an officer was acting within the course and scope of his duties in deciding whether a suspect may physically resist that officer's attempted arrest. *Chambers*, 973 So. 2d at 271. This appears to

---

[3] In his brief, plaintiff argues that Young's demeanor in the video depicts embarrassment on his part for the actions of his partner. Brief at 15. This court believes that it can discern the same rather sheepish sense of concern on the part of Young for the actions of his partner, and, if so, it seems entirely appropriate.

reflect a belief that the orderly operation of the law enforcement process requires that suspects comply with commands by arresting officers and to save any complaints about the validity of the arrest for later. There is, to be certain, legal recourse available to suspects who believe that they have been wrongfully arrested, and plaintiff would have been well advised to avail himself of those instead of refusing defendant's commands. Thus, while this court can fully understand plaintiff's dismay and frustration over his belief that he was being unfairly targeted by defendant, he would have been well advised to follow the commands to put his hands behind his back.

Plaintiff's failure to follow defendant's commands makes his efforts to recover for the initial decision to tase him considerably more difficult, which is why this court chooses to focus, in this order, on the decision to *continue* tasing plaintiff even after he appeared to have complied with commands to put his hands behind his back. This is consistent with this court's general practice, when evaluating a motion to dismiss or summary judgment, to first consider what it believes to be the plaintiff's *strongest* claim and then consider whether the defendant has a valid defense to that claim. In this vein, this court will put aside for the moment defendant's initial decision to tase plaintiff and concentrate upon one or more tasings which appear to have occurred after plaintiff had complied with commands to put his hands behind his back. The Fifth Circuit has held that even a proper initial use of force does not justify the use of force indefinitely, *see Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020), and this precedent clearly casts doubt upon the legality of tasing a suspect who initially resisted arrest but later elected to submit to authority. In finding that genuine fact issues exist regarding whether this actually occurred, this court believes that pictures speak louder than words. This court has accordingly screenshotted two excerpts from the video of the arrest in this case, with the second excerpt occurring (according to timestamps) one second after the first:





It is unclear to this court whether defendant would dispute that these screenshots depict

him tasing Bartlett after plaintiff, lying prostrate on the ground, had complied with instructions to

14

put his hands behind his back. For its part, this court believes that the first screenshot makes it abundantly clear that plaintiff had, in fact, placed his hands behind his back and was grasping his left wrist with his right hand, in a classic pose of submission and willingness to be handcuffed. While this seems quite evident to this court from the screenshot, it concludes that, at the very least, the video creates fact issues regarding whether plaintiff had submitted to law enforcement authority in such a manner that Miletello's additional tasing represented an objectively unreasonable application of force on his part. In so concluding, this court notes that defendant deliberately pressed his taser against plaintiff's body with his finger on the trigger, in exactly the same manner in which he did when he initially tased him. Moreover, it appears to this court, in watching the video at normal speed, that there is a certain "flick" in defendant's wrist around 6:31 or 6:32 of the video which strikes it as being consistent with the squeezing of a trigger. This court further believes that plaintiff's reaction to the tasing, depicted in the second screenshot, is entirely consistent with his reaction to the initial tasing. Indeed, the video demonstrates how, in response to the apparent tasing, plaintiff not only screams but turns over and reaches up towards Miletello in a manner which seems consistent with an individual reflexively trying to stop the taser from being placed against his body again. [Video at 6:33-6:34]. Once again, plaintiff had just had his hands behind his back while lying on his belly, and this court can discern no reason for such a sudden change in his behavior other than an additional tasing having been applied.

In light of the foregoing, this court will assume for the remainder of this opinion that plaintiff was, in fact, tased an additional time immediately after the first screenshot was taken, even though this is not conclusively established by the video evidence. Based on this assumption, this court believes that genuine fact issues exist regarding whether a reasonable

officer in Miletello's position would have had time to recognize that plaintiff had complied with his instructions before tasing him again. In so stating, this court acknowledges that real-life events do not take place in "screenshots," and it recognizes that the events in this case happened quickly. Even viewing the video at normal speed, however, this court was able to discern that, while lying down, plaintiff had flipped himself on his stomach and had, in fact, put his hands behind his back at the time defendant placed the taser against his body and (apparently) tased him again. This court believes that, at a bare minimum, a reasonable officer in defendant's position should have recognized that plaintiff was lying on his belly in a classic pose of submission and that he was in the *process* of complying with his orders to put his hands behind his back.

This court believes that it would be objectively unreasonable, in an obvious manner, to tase a suspect lying on the ground who was in the *process* of complying with orders to put his hands behind his back, even if he had not managed to lock one hand around his other wrist. Nevertheless, the above screenshots demonstrate that plaintiff had, in fact, managed to lock one hand around his other wrist behind his back at the time defendant took actions which certainly look to this court like an officer tasing a suspect. This court submits that, if defendant did not wish to create fact issues in this regard, then he should not have placed his taser against the body of a suspect lying on the ground with his hands behind his back and then moved his wrist in a manner which seems consistent with an individual tasing a suspect. Even in that scenario, this court would not have found fact issues regarding an unnecessary tasing if plaintiff had not reacted to defendant's actions in a manner which either reflects an individual being tased or one giving an Oscar-worthy performance of such. Under these facts, this court would find fact issues

regarding an unnecessary tasing even if it were viewing the facts in a completely neutral manner, and, once again, *Tolan* requires this court to resolve any factual ambiguities in favor of plaintiff.

A complicating factor in this context is that, in his amended complaint, plaintiff alleges that:

> 21. After this first tasing, Bartlett repeatedly said "You aren't using your power right." Bartlett was on the ground in a defenseless position with two police officers standing over him. Neither officer attempted to physically control Bartlett. Instead of attempting any number of possible procedures to control the situation, Miletello repeatedly tased Bartlett as Bartlett was laying on the ground. Bartlett tried to get his hands in the correct position to be handcuffed but was unable to do so due to the tasing.

[Amended complaint at 5]. Plaintiff thus alleges in his complaint that he was "in the process of complying" with the officer's instructions at the time he was tased, and he asserts that he was unable to get his hands in the correct position to be handcuffed. Once again, this court believes that it would be objectively unreasonable to tase a suspect lying on the ground who was even *attempting* to comply with orders to put his hands behind his back. Nevertheless, the first screenshot demonstrates that plaintiff had, in fact, managed to put his hands behind his back while lying on the ground at the time he was apparently tased. It is possible that plaintiff has a different understanding of what "the correct position to be handcuffed" means than this court does, but it would have assumed that the position depicted in the first screenshot would qualify in this regard.

That brings this court to the fact that the basic premise of defendant's motion to dismiss is that it should base its ruling on the video and not plaintiff's description of the video. This court concludes that the defendant is correct when he argues in his brief that "when allegations conflict with video, courts must view the facts in the light depicted by the videotape." [Brief at 7]. Of course, defendant makes this argument in regard to the portions of the video which show things *helpful* to him, in particular the fact that plaintiff refused to comply with a large number of

17

commands to put his hands behind his back. *Id.* It strikes this court that defendant must accept the sour along with the sweet in this context, however, and it reiterates that, in resolving cases, it is more interested in searching for the truth than in grading the care and skill with which the complaint was drafted by counsel. In filing its motion to dismiss, defendant has requested that this court rule based upon what is depicted in the video, and that is exactly what it will do in this order.

This court believes that the first screenshot indisputably demonstrates that plaintiff had, in fact, managed to put his hands behind his back at the time he was (apparently) tased again, and the only question is whether a reasonable officer in defendant's position would have had time to recognize this fact before tasing him again. Based on *Tolan*'s directive to resolve factual ambiguities in favor of the plaintiff, this court will assume that a reasonable officer would, in fact, have had time to see and understand that Bartlett had placed his hands behind his back at the time he tased him again. It does not require a great mental leap for this court to make this assumption since, once again, it was able to discern from the video, played at normal speed, that plaintiff had put his hands behind his back immediately prior to (apparently) being tased again. Certainly, the time periods involved in this sequence were quite short, but it clearly does not take a great deal of time to squeeze a trigger. Moreover, the video makes clear that putting his hands behind his back was the demand which defendant had repeatedly made of plaintiff, and, that being the case, it clearly strikes this court as objectively unreasonable for him to have tased him again during a period when, at a bare minimum, he could see that he was in the process of complying with his command. In so stating, this court observes that, at all times, defendant was aware that plaintiff was not suspected of having committed an act of violence, or a serious crime of any sort.

In making the above observations, it is entirely possible that this court has unnecessarily distinguished between an officer who tases a suspect who had already managed to put his hands behind his back and one who tases a suspect who, he sees, is *attempting* to do so. In so stating, this court observes that an officer who sees that a suspect is trying to comply with commands to put his hands behind his back, but who deliberately tases him again before he is able to do so, is likely to be an officer who does not *want* that suspect to comply with his command and who would prefer to continue inflicting pain upon him. This court believes that, as a factual matter, this scenario is particularly likely to occur in a case where the officer has a history of personal "bad blood" with a suspect and who has just promised to "teach him a lesson" and to "burn him the hell up" with his taser. It is far from clear to this court that this presents any less obvious a Fourth Amendment violation than it would be for an officer to tase a suspect who had already managed to put his hands behind his back. Based on the video, this court concludes that this case presents the latter scenario, but it believes that an obvious Fourth Amendment violation is presented under plaintiff's description of the facts in the amended complaint as well. In so stating, this court reiterates that defendant himself appears to believe that plaintiff's complaint properly alleges a Fourth Amendment violation in the complaint, and his contention is that those allegations are contradicted by the video of the arrest. That being the case, it may have been unnecessary for this court to even discuss this issue, but it wishes to provide as accurate a description of the video as possible.

As noted previously, the Fifth Circuit has held that even a proper initial use of force does not justify the use of force indefinitely, writing that:

> Force must be reduced once a suspect has been subdued. Notably, "subdued" does not mean "handcuffed." If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified. So even if

> Joseph failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely.

*Joseph*, 981 F.3d at 335. This court believes that this authority "clearly established" the law in this context, but, even assuming for the sake of argument that it did not, this court concludes that this case is a proper one for the application of the "obvious case" exception set forth in *Hope v. Pelzer,* 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002). In *Hope*, the Supreme Court considered an Eighth Amendment claim in a case where prison guards handcuffed a prisoner to a hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. *Hope,* 536 U.S. at 738, 122 S. Ct. 2508. Faced with these facts, six Supreme Court Justices concluded that the Eleventh Circuit erred in concluding that the defense of qualified immunity was available to the defendants. In so concluding, the Court observed that "[a]s the facts are alleged by *Hope*, the Eighth Amendment violations [are] obvious." *Id.* The Supreme Court reached this conclusion in spite of the fact that the plaintiff was unable to demonstrate federal appellate authority clearly establishing that it was unlawful to tie a prisoner to a hitching post.

In subsequent decisions, the Supreme Court has explained *Hope* as standing for the proposition that a failure to cite federal appellate authority supporting a claim may be excused in cases where the constitutional violation is "obvious." In the 2004 decision of *Brosseau v. Haugen,* for example, the Supreme Court wrote that:

> Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law. *See Hope v. Pelzer*, 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially *822 similar case for the right to be clearly established).

*Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S. Ct. 596, 160 L.Ed.2d 583 (2004). The U.S. Supreme Court applied the *Hope* exception once again in the 2020 decision of *Taylor v. Riojas*,

141 S. Ct. 52, 54, 208 L.Ed.2d 164 (2020), which involved a prisoner detained in deplorable

conditions, including "shockingly unsanitary cells." *Taylor*, 141 S. Ct. at 53. In concluding that

the case presented an "obvious" constitutional violation, the Supreme Court wrote that:

> [N]o reasonable correctional officer could have concluded that, under the extreme
> circumstances of this case, it was constitutionally permissible to house Taylor in such
> deplorably unsanitary conditions for such an extended period of time. See *Hope*, 536 U.S.
> at 741, 122 S. Ct. 2508 (explaining that " 'a general constitutional rule already identified
> in the decisional law may apply with obvious clarity to the specific conduct in question' "
> (quoting *United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L.Ed.2d 432
> (1997))); 536 U.S. at 745, 122 S. Ct. 2508 (holding that "[t]he obvious cruelty inherent"
> in putting inmates in certain wantonly "degrading and dangerous" situations provides
> officers "with some notice that their alleged conduct violate[s]" the Eighth Amendment).
> The Fifth Circuit identified no evidence that the conditions of Taylor's confinement were
> compelled by necessity or exigency.

*Taylor*, 141 S. Ct. at 53–54. The Supreme Court in *Taylor* thus concluded that facts supporting a

conclusion that a defendant acted with "cruelty" under circumstances where there was no

necessity to subject the prisoner to the conditions in question constituted an "obvious"

constitutional violation.

Hope and *Taylor* stand for the proposition that subjecting a plaintiff to cruel or inhumane

treatment when there is no law enforcement or penal necessity to do so constitutes an "obvious"

constitutional violation. In this case, this court believes that fact issues clearly exist regarding

whether defendant deliberately tased plaintiff after he saw that he had complied with commands

to put his hands behind his back and there was no law enforcement necessity to tase him again.

Even if this court were to (generously) assume, given the rapid nature of the events, that

defendant only had time to see that plaintiff was in the *process* of complying with his command,

it reiterates its belief that this would constitute an equally obvious Fourth Amendment violation.

In so stating, this court notes once again that an officer who recognizes that a suspect is trying to

comply with commands to put his hands behind his back, but who deliberately tases him again

21

before he is able to do so, is likely to be an officer who does not *want* that suspect to comply with his command and who would prefer to continue inflicting pain and suffering upon him.

The law does not allow officers to unnecessarily inflict pain upon suspects in order to vent their anger or personal animus towards them, and the immorality of such a course of action is so self-evident that, this court submits, no police officer needs case law instructing him against it. In this case, the evident history of bad blood between plaintiff and Miletello, the manner in which defendant clearly lost his temper in the video, and his own words promising to "teach plaintiff a lesson" and to "burn his ass up" with a taser could very reasonably lead jurors to conclude that defendant gave plaintiff at least one unnecessary tasing, not in order to subdue him for arrest, but to vent his personal anger and dislike towards him. This court believes that the video evidence could very reasonably lead jurors to conclude that this scenario took place in this case, and, if it did, how could this not represent an obvious Fourth Amendment violation under *Hope* and *Taylor*?

Having said that, this court emphasizes that, as with all other binding authority, it will not ignore the "clearly established" prong in cases where it is applicable. *See, e.g. Perkins v. Panola Cnty. Bd. of Supervisors*, 2024 WL 19952, at *7 (N.D. Miss. Jan. 2, 2024) (dismissing individual defendants on the basis of the "clearly applicable" prong). In so stating, this court recognizes that, at the end of the day, it is merely a trial court, and its job is to dance to the music written by the U.S. Supreme Court and the Fifth Circuit, regardless of whether it would have personally crafted a different melody if given the opportunity to do so. At the same time, this court stresses that the Supreme Court's decision in *Hope* is very much binding precedent as well in this case, and that decision, reaffirmed in *Taylor*, makes it clear that defendants may not rely on the "clearly established" prong in cases where it should have been obvious that they were

22

committing a constitutional violation. In the court's view, *Taylor*'s reference to "the obvious cruelty inherent" in subjecting a suspect to physical suffering without a law enforcement need to do so suggests that the *Hope* exception is particularly applicable in this context, which seems fully applicable here.

The *Hope* exception aside, this court notes that the Supreme Court has also stated that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). In the court's view, the fact that the Supreme Court stressed that "plain incompetence" on the part of an officer may serve to negate a qualified immunity defense is significant, since it represents something short of the iron wall of immunity which defendant appears to contend exists in this context. Moreover, this court believes that, in this case, fact issues exist regarding whether Officer Miletello demonstrated "plain incompetence" both during and before the application of the additional tasing in this case. In so stating, this court submits that any decision by defendant to assume a punitive "lesson teaching" function would take him outside of the scope of his job duties and would represent "plain incompetence" in exercising those duties, even assuming that he did not know he was violating the law by doing so.

Having said that, this court wishes to emphasize that its ruling today is not dependent upon its concerns regarding defendant's pre-tasing actions. To the contrary, this court would deny Officer Miletello's motion to dismiss based solely upon fact issues arising from his (apparent) decision to tase plaintiff after he had put his hands behind his back, even if his behavior up to this point had been entirely proper. However, defendant's pre-tasing behavior does provide reassurance to this court that, in rejecting his qualified immunity defense at this stage of the proceedings, it is not unduly second-guessing an officer who was simply trying to

"do things the right way." Moreover, on a more fundamental level, this court emphasizes that, in filing his motion to dismiss, defendant had one overriding request of this court: to just watch the video. This court did, in fact, watch the video, and it would be ironic indeed if defendant objected to it giving its honest impressions of his conduct in that video.

Defendant's final defense to plaintiff's Fourth Amendment claim is his argument that "it is far from clear that Plaintiff suffered a cognizable injury" in this case. [Brief at 7]. This court notes that, at this juncture, the extent of plaintiff's injuries does not have to be "clear," but it concludes that the second screenshot clearly establishes fact issues regarding whether he suffered more than a *de minimis* amount of pain and suffering from an unnecessary tasing. In so stating, this court agrees with plaintiff's observation that the Fifth Circuit has never declared that tasings constitute a *de minimus* injury, even though it could have saved itself a great deal of time and effort in other tasing cases if it had done so. In the court's view, a blanket holding that tasings were *de minimis* as a matter of law would essentially give police officers in this circuit free reign to give suspects one additional tasing "for good measure." This court can discern no public policy justification for such a result.

In finding that fact issues exist regarding whether a cognizable injury occurred in this court, this court notes that U.S. Supreme Court precedent "allows recovery for actual damages as well as mental and emotional distress," *Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 306–07, 106 S.Ct. 2537 (1986), and there is no requirement that such emotional distress arise from an actual physical injury. Having said that, this court notes that federal law already provides plaintiffs with disincentives against pursuing claims involving minor injuries, since any jury awards which result are likely not to be worth the time and expense in prosecuting them. Indeed, the U.S. Supreme Court has held that the amount of attorneys' fees properly awarded in

§ 1983 depends largely upon the *degree* of success achieved by the plaintiff's counsel, *see Farrar v. Hobby*, 506 U.S. 103, 106 (1992), which provides further incentive against pursuing truly minor claims. Thus, while it may be true that this case does not have as large a dollar value as plaintiff would like for it to have, this court concludes that the video clearly presents fact issues regarding whether he suffered more than a *de minimis* injury in this case.

That brings this court to the important fact that its ruling that fact issues precluding a grant of qualified immunity is not the same thing as an irrevocable denial of defendant's qualified immunity defense. To the contrary, defendant will have the opportunity to assert the defense once more at the summary judgment stage of proceedings following discovery, and, if this court continues to find that fact issues exist in this regard, a jury will eventually decide whether qualified immunity applies at trial. Indeed, this court notes that the Fifth Circuit has written model qualified immunity jury instructions specifically for this purpose, which illustrates that no irrevocable decision regarding qualified immunity is being made at this time.

In this vein, this court notes that it very recently refused to set aside a jury verdict in another taser case, in which jurors found that a police officer had used excessive force by tasing a surrendering plaintiff but that the officer was nevertheless entitled to qualified immunity. *Trabucco v. Rivera*, No. 3:22-CV-00132-MPM, 2024 WL 3593916, at *1 (N.D. Miss. July 24, 2024). In denying the plaintiff's motion to set aside the jury's verdict in *Trabucco*, this court wrote that:

> While this Court might disagree with the jury's verdict in this case, it cannot say that the verdict was against the overwhelming weight of the evidence. Under the present court-made body of law known as "qualified immunity," we are constrained to tolerate jury verdicts finding immunity for defendants who tase kneeling individuals in the back. This outcome is dictated by authority cited by the defendant, namely *Salazar v. Molina*, where the Fifth Circuit held that an officer did not violate the Fourth Amendment by applying a ten second tasing on a suspect who is lying prone on the ground with his hands above his head. *Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022). So long as *Salazar* remains good

law in this circuit, trial courts and juries will be hard-pressed to find grounds to award a
verdict for a plaintiff whose constitutional rights have been violated.

*Trabucco v. Rivera*, No. 3:22-CV-00132-MPM, 2024 WL 3593916, at *1 (N.D. Miss. July 24,

2024).

 In refusing to set aside the jury's finding of qualified immunity in *Trabucco*, this court

based its ruling largely on the Fifth Circuit's decision in *Salazer*. *Salazar* involved a tasing

which followed a high speed chase by a suspect, and, in describing the application of force in

that case, the Fifth Circuit wrote that:

> Just as Salazar finished lowering himself to the ground, Deputy Juan Molina brought his
> patrol car to a stop behind Salazar's vehicle. Molina exited his vehicle and ran toward
> Salazar. Salazar remained on the ground but uncrossed his legs two seconds before
> Molina got to him. Upon reaching Salazar—eight seconds after Salazar had stopped his
> car—Molina fired his taser at Salazar's back.

*Salazar,* 37 F.4th at 280. While this court likely would have reached a different result than the

Fifth Circuit in *Salazar*, it remains obligated to apply that decision, like all other binding

authority in this case. For this reason, this court regards it as highly significant that, in reaching

its decision, the *Salazar* panel wrote that:

> First, as a matter of common sense, what preceded the surrender matters. A reasonable
> officer will have little cause to doubt the apparent surrender of a compliant suspect who
> has not engaged in dangerous or evasive behavior. But when a suspect has put officers
> and bystanders in harm's way to try to evade capture, it is reasonable for officers to
> question whether the now-cornered suspect's purported surrender is a ploy. That's
> especially true when a suspect is unrestrained, in close proximity to the officers, and
> potentially in possession of a weapon.

*Id.* at 282.

 In the court's view, this portion of *Salazar* suggests that even the panel which decided

that case would *not* have found qualified immunity in a case where an officer tased a suspect in

the back when that suspect had not "put the officers and bystanders in harms way." *Id.* This

court believes that this is clearly the case here, since at no point did plaintiff employ a dangerous

26

instrumentality of any kind, such as a speeding vehicle, in resisting arrest. This court therefore concludes that, whatever its concerns with *Salazar* may be, the Fifth Circuit's decision does not support the grant of qualified immunity in this case, particularly in the Rule 12 context before discovery has even been conducted. Having said that, if the jury in this case does eventually decide that qualified immunity applies here, then this court will very likely do what it did in *Trabucco* and defer to its judgment in this regard.

At this juncture, this court is simply ruling on a qualified immunity motion which defendant chose to make on the basis of a single piece of evidence: namely, a videotape which appears to depict him promising to improperly assume the role of jury and punisher in this case and which also appears to show him backing up this promise by giving plaintiff at least one additional tasing "for good measure" even after he was lying on the ground and had complied with instructions to put his hands behind his back. Considering this evidence in the light most favorable to plaintiff, this court cannot in good conscience simply send defendant on his way and dismiss him from this case before discovery has even been conducted. Defendant's motion to dismiss the Fourth Amendment excessive force claims against him on the basis of qualified immunity will therefore be denied, without prejudice to his right to assert that defense on summary judgment.

This court notes that, while plaintiff asserts a First Amendment retaliation claim in his complaint, he includes his discussion of this claim in the section of his brief dealing with "non-qualified immunity" claims. This court is presently ruling on qualified immunity issues in this case, and it interprets plaintiff's briefing as a tacit concession that he cannot survive a qualified immunity defense as to his First Amendment retaliation claims. Indeed, aside from the portion of plaintiff's brief in which his First Amendment retaliation arguments are presented, this court

concludes that they substantively fail to rebut defendant's qualified immunity defense, including by failing to provide authority "clearly establishing" that, under plaintiff's version of the facts, defendant's conduct would have constituted a violation of the First Amendment.

This court further believes that *Heck* casts a much longer shadow over plaintiff's First Amendment retaliation claims than it does over his Fourth Amendment excessive force claims. In so stating, this court notes that plaintiff's First Amendment claims take issue with the basic *reason* for defendant trying to arrest him, and he contends that this reason was his exercise of his First Amendment rights to comment on the manner in which Miletello was carrying out his job duties. While this court does not regard this as necessarily being an unreasonable argument in this case, his conviction for resisting arrest raises concerns, stressed by defendant, that he is attempting to "backdoor" a false arrest claim barred by *Heck* by asserting it under the guise of a First Amendment retaliation claim. This court tends to agree with defendant that, unless and until it is overturned on appeal, this conviction serves as a very significant procedural obstacle to any claims which are based on assertions that the decision to arrest him was based on some unlawful motive.

*Heck*'s bar aside, this court notes that the U.S. Supreme Court held in *Graham v. Connor* that "all claims that law enforcement officers have used excessive force- deadly or not- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. The Supreme Court followed a similar approach in *Albright v. Oliver*, 510 U.S. 266, 274 (1994), holding that malicious prosecution claims should be considered in the Fourth Amendment context. The Supreme Court has thus

demonstrated a strong preference for using the Fourth Amendment to analyze claims similar to the ones in this case, and it seems likely to this court that it would do the same here.

While it at least seems possible that plaintiff would be able to circumvent the separate bars arising from *Heck* and *Graham/Albright*, his First Amendment retaliation claim in this case strikes this court as a rather novel one with dubious prospects. Of course, qualified immunity is the place where novel claims, as well as the reasonable development of the law, go to die, since the Supreme Court has made it clear that officers can only be held individually liable based on violations of clearly established law. This is presumably why plaintiff included this claim in the "non-qualified immunity" portion of his brief. This strikes this court as a tacit concession of defendant's qualified immunity defense, and it has only addressed the merits of the issue out of an abundance of caution. This court will accordingly grant defendant's qualified immunity defense as to the First Amendment retaliation claims asserted against him in his individual capacity, and it will defer a ruling on any such claims against the City of Winona until it considers municipal liability issues in the context of a motion for summary judgment following discovery. Indeed, this court will follow this approach with regard to the all of the claims against the City since, once again, its normal practice is to decide difficult constitutional issues on summary judgment following discovery, and *Carswell* only limits its ability to do so with regard to qualified immunity defenses asserted by individual officers.

While this court thus concludes that the litigation of this case should proceed, it would note its belief that this is a case which virtually cries out to be settled. In so stating, this court notes its very strong belief that, while the litigation of the qualified immunity and other issues in this case will be very expensive for both sides, the nature of plaintiff's damages and, frankly, the conservative tendencies of jurors in this district mean that, even if he eventually prevails at trial,

his damages are likely to be far less than he would prefer. Indeed, this court has witnessed many verdicts returned by North Mississippi jurors in § 1983 cases involving law enforcement officers, and to state that these verdicts do not lend themselves to confidence on the part of plaintiffs would be a gross understatement. Moreover, while this court's analysis of the video of the arrest leads it to conclude (at least at this juncture) that fact issues exist regarding plaintiff's excessive force claims, it seems likely that his rather disrespectful "act" depicted in the video will not play well with North Mississippi jurors. While this court therefore believes that jury appeal issues favor defendant in this case, it strongly encourages the City of Winona to take an objective look at the screenshots posted above and the actions and statements of Officer Miletello in the video and ask whether this is how it wants its officers to represent it in the community. If the answer to this question is "no," then this court submits that the City should be prepared to offer plaintiff at least some compensation for his damages in this case. This is particularly true considering the very considerable expenses which it will be forced to incur in defending against plaintiff's claims. [4]

As a final point, this court notes that it cannot recall having included a "screenshot" of a video in one of its qualified immunity opinions, and it has chosen to do so in this case partly to give a human "face" to the dry legal issues which tend to predominate in the qualified immunity context. In taking this action, this court is also aware that, as evidenced by *Salazar*, denials of qualified immunity often receive a less-than warm reception at the Fifth Circuit. If that proves to be the case here as well then, by including the screenshot of plaintiff writhing in agony after

---

[4] In so stating, this court notes that, in its experience, municipalities, and not individual officers, end up paying for even claims asserted against officers individually in § 1983 cases. Indeed, this court's firm recollection is that there is a Mississippi Attorney General's opinion concluding that this is required by Mississippi law, although it is unaware of its exact citation.

having been tased in the back while lying on the ground with his hands behind his back, then this court will at least have left some record of the unnecessary infliction of pain which, it believes, is made more likely by an expansive application of the qualified immunity doctrine.

This court is far from alone in expressing concerns regarding the qualified immunity doctrine, in particular its "clearly established" prong.  Most memorably, Fifth Circuit Judge Don Willett offered an eloquent criticism of the absurdities of this prong in a 2019 concurrence, describing it as:

> Section 1983 meets Catch-22. Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books. No precedent = no clearly established law = no liability. An Escherian Stairwell. Heads government wins, tails plaintiff loses.

*Zadeh v. Robinson*, 928 F.3d 457, 479–80 (5th Cir. 2019) (Willett concurring).  Judge Willett's words make it clear that serious concerns exist regarding the "clearly established" prong even among Fifth Circuit judges, and this court has repeatedly quoted his concurrence to make this point clear.  Indeed, this court believes that allowing officers to arbitrarily and unnecessarily inflict pain upon surrendering suspects brings discredit upon the federal judiciary, and it has frequently sought to interpret existing precedent with this in mind.

In particular, this court believes that the U.S. Supreme Court's decision in *Hope* provides district courts with a legal basis to avoid making rulings which would serve to give comfort to officers who believe that they have a right to unnecessarily inflict pain upon suspects, based upon anger, sadism, or some misguided attempt to assume the role of "lesson teacher."  This court regards it as "obvious" within the meaning of *Hope* that the Constitution does not permit such a course of action, and, while it is aware that some judges are more hesitant to apply this Supreme Court precedent than others, this court regards it as a way to avoid unconscionable

31

results while still upholding its oath as a federal judge to follow the law.  As this court noted in a recent opinion:

> [T]he "clearly established" prong is known for producing absurd results, and it at least seems possible that this case will eventually end up mounted above its fireplace as another example of this fact. But this court will not be the one to put it there.

*Linares v. Maze*, 2023 WL 5969690, at *5 (N.D. Miss. Sept. 13, 2023).   Officer Miletello's qualified immunity motion will therefore be denied as to the excessive force claim against him arising from the single tasing discussed above, but it will otherwise be granted.  This court will consider the City's municipal defenses in this case in the context of a summary judgment motion filed after discovery.

This, the 11th day of September, 2024.


/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI